DONALD L. WILSON, LOUIS STERNBACH AND PLAINFIELD TRUST STATE NATIONAL BANK, CO-EXECUTORS AND CO-TRUSTEES UNDER THE WILL OF JOSEPH L. K. SNYDER, DECEASED, PLAINTIFFS-RESPONDENTS, v. SARA LOUISE FLOWERS, ANNA DOUDS SNYDER, EXECUTRIX UNDER THE WILL OF JACOB MARCHAND SNYDER, DECEASED, DEFENDANTS-APPELLANTS, AND GEORGE F. KUGLER, ATTORNEY GENERAL OF NEW JERSEY, DEFENDANT.

Argued January 12 and 25, 1971—Decided May 10, 1971.

Mr. *Woodruff J. English* argued the cause for defendants-appellants (*Messrs. McCarter & English,* attorneys).

Mr. *Alfred C. Clapp* argued the cause for plaintiffs-respondents (*Messrs. Hetfield & Hetfield,* attorneys).

The opinion of the Court was delivered by

PROCTOR, J. This is a will construction case. Plaintiffs, trustees under the will of Joseph L. K. Snyder, filed a complaint in the Chancery Division seeking instructions regard-

ing the validity of Article Sixth (C)(12) of the testator's residuary trust of his will which directs them, *inter alia,* to contribute 20% of the residue "to such *philanthropic* causes as my Trustees may select" (emphasis added).

Defendants are the next-of-kin of the testator,[1] and the Attorney General of New Jersey. The latter did not participate in the litigation.

After a hearing, Judge Mintz held that the plaintiffs had established the testator's probable intent that the gifts to "philanthropic causes" be solely charitable in nature. Thus, the gifts were not void and did not pass by intestate succession. Judgment directed 1) that the plaintiffs "shall contribute solely to charitable purposes the income to be disposed under Article Sixth (C)(12) of" the will, 2) that "the dispositions * * * do not violate the rule against perpetuities," and 3) that plaintiffs-trustees "in making contributions to philanthropic causes pursuant to Article Sixth (C)(12) of said will are restricted solely to charities which qualify as charities under Section 2055(a)(3) of the Internal Revenue Code[2] and *N. J. S. A.* 54:34-4(d),[3] as presently amended."

---

[1]The next-of-kin are Sara Louise Flowers, a daughter of Nevin Snyder, a brother who predeceased testator, and Anna Douds Snyder, executrix under the Will of Jacob Marchand Snyder, a brother who survived testator by six months.

[2]Section 2055(a)(3) of the Internal Revenue Code exempts from Federal estate tax gifts:

"to a trustee or trustees, or a fraternal society, order, or association operating under the lodge system, but only if such contributions or gifts are to be used by such trustee or trustees, or by such fraternal society, order, or association, exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no substantial part of the activities of such trustee or trustees, or of such fraternal society, order, or association, is carrying on propaganda, or otherwise attempting, to influence legislation, and such trustee or trustees, or such fraternal society, order, or association, does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office;"

[3]*N. J. S. A.* 54:34-4(d) exempts from the New Jersey Transfer Inheritance tax:

Defendants next-of-kin appealed to the Appellate Division and prior to argument there, we certified the case on our own motion.

The primary issue on this appeal is whether the testator, in using the term "philanthropic causes," intended to limit his bounty to charitable causes or whether he intended the term to have a broader meaning. If the trust is not limited to charitable purposes, it is void either for uncertainty or for a violation of the rule against perpetuities. *Kitchen v. Pitney*, 94 *N. J. Eq.* 485 (E. & A. 1923); *Sheen v. Sheen*, 126 *N. J. Eq.* 132, 140 (Ch. 1939); *Hegeman's Ex'rs. v. Roome*, 70 *N. J. Eq.* 562 (Ch. 1905). Defendants contend that the trust is void and that it should pass to them by intestate succession.

On February 28, 1965, Joseph L. K. Snyder died leaving a Will dated September 30, 1960 and a Codicil thereto dated December 18, 1964.[4] Both were probated on March 29, 1965. By Articles First Through Fifth the testator directed that his taxes, debts and other expenses be paid and that certain modest legacies be given to named individuals. The great bulk of his estate was disposed of by Article Sixth, which deals with the residuary. By this provision he bequeathed his residuary estate in trust, with directions to pay the income

---

"That part of the estate of any decedent which passes to, for the use of or in trust for any educational institution, church, hospital, orphan asylum, public library or Bible and tract society or to, for the use of or in trust for any institution or organization organized and operated exclusively for religious, charitable, benevolent, scientific, literary or educational purposes, including any institution instructing the blind in the use of dogs as guides, no part of the net earnings of which inures to the benefit of any private stockholder or other individual or corporation; provided, that this exemption shall not extend to transfers of property to such educational institutions and organizations of other States, the District of Columbia, territories and foreign countries which do not grant an equal, and like exemption of transfers of property for the benefit of such institutions and organizations of this State."

[4]The Codicil did not deal with the provision of the Will challenged here, and it is not material to this appeal.

therefrom to three individuals for life (no beneficiary to receive income exceeding an average of $25,000 per year over a period of five consecutive years). Under Subsections (1) to (12) of Section (C) of Article Sixth the decedent directed that the balance of principal and accumulated income of the residuary estate be continued "in perpetual trust" and that the net income be distributed to the beneficiaries in the following proportions:

(1) 25% to Franklin and Marshall College for the education of needy and deserving students.

(2) 10% to the Theological Seminary of the Reformed Church of Lancaster, Pennsylvania, to be used for disabled or retired ministers and their widows.

(3) 10% to the same seminary for the education of needy and deserving students.

(4) 5% to the American Cancer Society, Inc.

(5) 2½% to Muhlenberg Hospital of Plainfield, New Jersey.

(6) 2½% to The Community Chest of Plainfield and North Plainfield.

(7) 2½% to the Crescent Avenue Presbyterian Church of Plainfield.

(8) 2½% to the United Family & Children's Society.

(9) 10% to Emanuel Reformed Church, Export, Pennsylvania, for college scholarships and loans and church expenses.

(10) 5% to The Chemists Club of New York for the maintenance of its public library.

(11) 5% to the American Foundation for the Blind, Inc.

Defendants do not challenge the qualification of the above beneficiaries as charities. Their attack is limited to the language of Subsection (12) by which the remainder of the residue is disposed. That subsection reads in pertinent part:

(12) To contribute the remaining twenty per cent (20%) thereof, together with income on hand by reason of the defection of any bequest under Subsections (1) through (11) of Section (C) of this Article Sixth, to such philanthropic causes as my Trustees may select,

special consideration, however, to be given to charitable, educational and scientific fields, including universities, research laboratories, foundations or organizations formed for the purpose of the combating of and research on degenerative diseases.

It is estimated that the residuary estate will amount to $2,000,000.

Defendants contend that the word "philanthropic" is broader than the word "charitable" both in terms of the testator's intent so far as that intent can be gleaned from the four corners of the will and in terms of its generally accepted meaning.

Turning to the second point first, we have been cited to no New Jersey case construing the word "philanthropic." However, there are many cases construing the word "benevolent" which defendants contend is more restrictive than "philanthropic." The cases follow the English rule that "benevolent" is broader than "charitable" and that a trust for such purposes is therefore void. *Thomson's Executors v. Norris,* 20 *N. J. Eq.* 489 (E. & A. 1905) ; *Smith v. Pond,* 90 *N. J. Eq.* 445 (Ch. 1919), *rev'd on other grounds,* 92 *N. J. Eq.* 211 (E. & A. 1920) ; *Hegeman's Executors v. Roome,* 70 *N. J. Eq.* 562 (Ch. 1905). See also the English cases *Morice v. Bishop of Durham* [1804] 9 *Ves.* 399, *aff'd* [1805] 10 *Ves.* 521; *Chichester Diocesean Fund v. Simpson* [1944] *A. C.* 341.[5]

[5]This result was reached even though it was sometimes recognized that the testator's intent was being thwarted. In *Smith v. Pond,* 90 *N. J. Eq.* 445 (Ch. 1919), *rev'd on other grounds,* 92 *N. J. Eq.* 211 (E. & A. 1920), Vice Chancellor Backes regretfully held that a gift for "such benevolent purposes as the trustees" shall direct was void :

> The result that I have reached, upon principle and authority, is not to my satisfaction, for I am of the impression that the testatrix understood benevolent to be synonymous with charitable, and it is regrettable that her wishes should be frustrated by the inadvertent use of an inept term. 90 *N. J. Eq.* at 451.

See also the remarks of Lord Justice Goddard in *Chichester Diocesean Fund v. Simpson* [1944] *A. C.* 341, where he, feeling bound by precedent, nevertheless was disposed to comment that if it had been pointed out to the testator that the result of the insertion of the words "or benevolent" would be that the money would not go to

Defendants urge that since New Jersey courts follow the English cases that hold "benevolent" is broader than "charitable," they must, a fortiori, follow the English cases that hold that "philanthropic" is broader than "charitable." *Eades v. Eades* [1920] 2 *Ch.* 353; *In re Macduff* [C. A. 1896] 2 *Ch.* 451. We cannot accept this argument. It is no longer clear that "philanthropic" by legal connotation is broader than "charitable" in its legal connotation. Bogert has stated:

> At the present time it would seem that the intent of a donor who leaves property to be distributed for "benevolent" or "philanthropic" purposes is in most cases charitable. If the duration of the trust is indefinite or perpetual a trust to show mere liberality will be void and in addition it will be subject to heavy tax burdens. Few trustors will desire these results. Common usage has made these words synonyms for charity.
>
> \*     \*     \*     \*     \*     \*     \*     \*
>
> The word "philanthropic" would seem, in its liberal sense, to include all acts of friendliness to mankind, whether conducive to improvement of society or merely to enrichment and enjoyment. In some English cases the word has been construed in this sense, and the result has been that a trust for "philanthropic purposes" has been held non-charitable because it would permit the trustee to perform acts of mere friendliness and generosity, having no connection with the need of the recipients of the benefits and no regard for the effect of the bounty upon the "beneficiaries." This is, however, perhaps a rather bookish meaning of the word. Probably in common use it is taken to mean charity, and some tendency to give it that effect is observable, especially where it is linked with the word "charitable" or with admittedly charitable objects. *Bogert, Trusts & Trustees*, § 370, p. 69, 70 (2d ed. 1964).

There are a number of cases which have rejected the English cases and have treated "philanthropic" as synonymous with "charitable." *E. g., MacKinnon v. MacKinnon* [1909] *Sess. Cas.* 1041 ("charitable or philanthropic" institutions are charitable institutions) ; *Rotch v. Emerson*, 105 *Mass.* 431 (1870)

charity, but to his first cousins once removed of whose existence he probably did not even know, there is not the least doubt in the world that he would, provided he was of sound mind and memory and understanding, have said, "cut out the word 'benevolent'."

("for the promotion of argicultural or horticultural improvements, or other philosophical or philanthropic purposes" are charitable purposes) ; *Thorp v. Lund, 227 Mass.* 474, 116 N. E. 946 (1917) ("national and philanthropic purposes" are charitable purposes) ; *Thorp v. Lund, 227 Mass.* 474, 116 *Loggie*), [1954] *S. C. R.* 645 ("for such charitable, religious, educational or philanthropic purposes as the trustees shall appoint" are charitable purposes) (noted in 33 *Can. B. Rev.* 334 (1955) ; *Moore v. Sellers, 201 S. W.* 2d 248 (Tex. Civ. App. 1947) ("charitable, philanthropic, religious and/or educational institutions, societies, organizations or undertakings" are charitable purposes).[6]

But defendants contend that even if philanthropic and charitable have come to mean the same thing, the manner in which the word "philanthropic" is used in the present case indicates a contrary intent. Testator's will directs that 20% of the residue of the estate be given, in trust, "to such philanthropic causes as my Trustees may select, special consideration, however, to be given to charitable, educational and scientific fields." Defendants argue that the "special consideration" clause evidences an intent that charitable, educational and scientific uses must merely be some of the

---

[6]Numerous courts have also adopted the modern rule that "benevolent" and "charitable" are synonymous. *E. g., St. Louis Union Trust Co. v. Burnet,* 59 *F.* 2d 922 (8 Cir. 1932) ; *In Re Dulles' Estate,* 218 *Pa.* 162, 67 *A.* 49 (1907) ; *Fox v. Gibbs,* 86 *Me.* 87, 29 *A.* 940 (1894) ; *Chicago Bank of Commerce v. McPherson,* 2 *F. Supp.* 110 (W. D. Mich. 1931), *aff'd* 62 *F.* 2d 393 (6 Cir. 1932), *cert. denied* 289 *U. S.* 736, 53 *S. Ct.* 596, 77 *L. Ed.* 1484 (1933) ; *In re Snell's Will (Robinson v. Hammel),* 154 *Kan.* 654, 121 *P.* 2d 200 (1942) ; *Sands v. Security Trust Company,* 143 *W. Va.* 522, 102 *S. E.* 2d 733 (1958). See also cases cited in 4 *Scott, Trusts,* § 398.1, p. 3068, n. 19 (3d ed 1967). New Jersey, like many other states, now has a statute which joins the terms "charitable" and "benevolent" in such a manner that it is apparent the terms are to be given like legal effect. See *N. J. S. A.* 15:14–6; see *Smith v. Pond,* 92 *N. J. Eq.* 211 (E. & A. 1920). See also *N. J. S. A.* 54:34–4(d) ; *In re Kuebler,* 106 *N. J. Super.* 13, 21 (App. Div. 1969). These statutes do not, however, use the word "philanthropic," and thus do not answer the problem at hand.

philanthropic uses to which the funds may be given. Thus, they contend "philanthropic" is broader than "charitable" as the testator used it.

It is our duty to follow what we find to be the testator's probable intention. The commonly accepted meaning of words and their context is a strong indication of intent, but that is not the end of the matter. There are frequently other manifestations of intent. In the present case, if we were to accept defendants' argument, we would be left with the conclusion that the testator intended to die intestate. Yet as we noted in *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561, 572 (1962), there is a strong presumption that testators do not intend to die intestate, particularly where, as here, the gift is made out of the residuary estate. As we noted there, "The idea of anyone deliberately purposing to die testate as to a portion of his estate and intestate as to another portion is so unusual in the history of testamentary disposition as to justify almost any construction to escape it." *Id.,* quoting 2 *Redfield on Wills* (3d ed. 235). This presumption is reinforced by the testator's mandate that his trust be perpetual. A perpetual trust for noncharitable purposes would be void, and it is unlikely that the testator intended that result. See *Moore v. Sellers, supra.*

There is another factor which indicates the testator intended "philanthropic" to be synonymous with "charitable." The other parts of his will demonstrate an interest in charitable causes. In sections (C)(1) through (C)(11), the testator disposed of 80% of the residuary to eleven specific admittedly charitable causes. Only (C)(12), the remaining section of his residuary trust, is challenged here. An overall feeling of charity pervades section (C) and that the testator should link 11 specific charitable causes with the term "philanthropic causes" is an indication that he intended his entire residuary estate to be devoted to charitable causes. See *Bogert, supra* at § 370, p. 69, 70.

Of course, these general indications of intent do not answer defendants' argument that the juxtaposition of the

language employed shows the testator intended "philanthropic" to be broader than "charitable." But there is direct evidence which answers the argument. At the trial the scrivener of the will testified, over objection, regarding the reason for the language used:

The only thing I can think of that I used it was not to repeat the word "charitable" which is used in the same sentence. And it was used with the intent by me to interpret — to convey the impression of the testator in the writing used synonymously with the word charities or charitable. There is no question about that.

THE COURT: In other words, the word "philanthropic" was a word of your choosing?

THE WITNESS: Of my choosing and used synonymously with the word charitable because I used the word charitable in the same sentence. I have an abhorrence of repeating the same word twice in the same sentence, or thought.

In other words, the reason for the use of the word "philanthropic" was the scrivener's wish to avoid repetition of the word "charitable"; in his view the two words were synonymous.[7] This testimony comports with all of the other evidence presented at the trial. The testator told the scrivener that he "wanted his entire residuary estate devoted and left to charities * * * in a perpetual trust * * * That was one thought that prevailed in all of the wills that I prepared for him * * *.";[8] he wanted his residuary estate to be exempt from state and federal estate taxes.[9]

Also in evidence were two memoranda drafted by the testator. In the first, a nine page memorandum used in preparation of his 1958 will (later revoked), the testator in-

---

[7]This technique is referred to pejoratively by Fowler as "elegant variation." *Fowler, A Dictionary of Modern English Usage,* 148–51 (2d ed. 1965). See also *Nicholson, A Dictionary of American-English Usage,* 147–149 (1957).

[8]In the six wills preceding the probated will of 1960 and its codicil of 1964 the residuary estate was devoted primarily to charity.

[9]Thus, after receiving a tax analysis from a trust officer of his bank in 1957, he amended his gift to the Chemists Club to limit it to the Club's library which is open to the public. This action assured that the gift would qualify as charitable.

dicated that his purpose was "to set up a trust fund to run into perpetuity income from which shall be disposed of in several charitable directions." Notes made on this memorandum by the scrivener during conference demonstrate the testator's preoccupation with insuring that his residuary estate be tax exempt. Although this memorandum was drafted in preparation of an earlier will, it is nevertheless significant since the disposition of the residuary estate under that will roughly parallels the disposition under the present will. The second memorandum dated May 25, 1960, also demonstrated the testator's interest in charities. There is no doubt of the testator's intent if this evidence was properly admitted. But defendants contend that all evidence pertaining to the reason for the use of the word "philanthropic" should have been excluded because it went "too far in extending the doctrine of probable intent." They urge that the trial court erred in admitting: 1) testator's previous wills to show that the testator intended "philanthropic" to be synonymous wtih "charitable"; 2) the testator's memoranda of November 30, 1957 and May 25, 1960, which showed a concern for charitable gifts; 3) the 1957 tax analysis which showed a concern for charitable tax deductions, and 4) the scrivener's testimony for the use of the word "philanthropic."

In *Fidelity Union Trust v. Robert, supra,* we made it clear that our function in construing a will is to ascertain and give effect to the probable intention of the testator. In ascertaining probable intent, we need not give precedents involving the construction of other wills great force since our inquiry is confined to the will at hand. Extrinsic evidence which furnishes information regarding the circumstances surrounding the testator should be admitted to aid in ascertaining his probable intent under the will. Where the probable intent is thus made manifest by extrinsic evidence, the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument.

Accordingly, we see no difficulty whatsoever involving the prior wills and the tax analysis. They were relevant and

properly admitted since they furnished information of the circumstances surrounding the testator. They were not admitted to vary the will, but merely to shed light on the use of the word "philanthropic." As we have already shown, that word is somewhat ambiguous.

The remaining question is whether the scrivener's testimony and the testator's memoranda should have been admitted. The scrivener's testimony included declarations by the testator that he wanted his entire residuary estate to go to charity, and that the scrivener used the word "philanthropic" as a synonym for "charitable." The memoranda demonstrated testator's charitable intentions. In *In re Cook,* 44 *N. J.* 1 (1965), this Court considered the question whether the wife of a stepson was entitled to share in the testatrix's estate or whether the gift should lapse. In construing the will, we noted that the testatrix had said "she felt under obligation to provide for Viola as Raymond's widow and heir and that *she had done so by the will she had executed"* (emphasis added) and that she had told Viola "that [Viola] would share in her estate as Raymond's widow and heir." *Id.* at 5. Thus, we considered a direct statement by the testatrix of her intent because it helped to explain the meaning of a provision of her will. We did so even though the commonly accepted legal definition of that provision was to the contrary.

In subsequent cases, we have looked to the files of the scrivener and the practice of the firm which drew up the will in an effort to learn the testator's probable intent. *Chase Manhattan Bank, et al. v. Mitchell,* 53 *N. J.* 415, 417 (1969); *In re Thompson,* 53 *N. J.* 276, 279 (1969). We have even remanded a cause to permit the taking of testimony from the scrivener for evidence bearing on the intention of the testator. *Surina v. Gilbert,* 54 *N. J.* 68, 70 (1969). It is true, as defendants urge, that in neither *Chase Manhattan Bank* nor *Thompson* did the files reveal any useful information. And in *Surina,* the scrivener's testimony was merely confirmatory of what we already understood the will to

mean. However, these circumstances do not detract from the purpose of our inquiries and defendants are mistaken in intimating that we would have ignored the evidence had it been otherwise. Nevertheless, there is some merit to defendants' statement that there is no clear holding by this Court explaining the standards to be used in determining the scope of extrinsic evidence to be admitted. They urge that if direct statements of testator's intention are to be admitted, we should say so unequivocally and clarify "the subtleties of latent and patent ambiguities."

It is true that pre-*Cook* cases in this state recognized a distinction between "patent" and "latent" ambiguities. Latent ambiguities are those which arise where the will is plain on its face but by reason of extraneous facts, the words of the instrument could apply to two or more persons or things. *In re Armour,* 11 *N. J.* 257 (1953) ; *Golden v. Casa For Sacerdoti Vecchi ed Invalidi,* 30 *N. J. Super.* 242 (App. Div. 1954). In such cases extrinsic evidence including direct statements by a testator of his intention have always been held admissible, not to vary the terms of the will, but to explain the ambiguity. In cases of patent ambiguities — those which arise from the language of the will itself — direct statements of intention were excluded. See *In re Armour, supra; In re Hoffman's Estate,* 53 *N. J. Super.* 396 (App. Div. 1959). Text writers have rejected the distinction between patent and latent ambiguities as "discarded," "unprofitable" and "unfortunate." 4 *Page, Wills* § 32.7, pp. 254–259 ; *Thayer, Preliminary Treatise on Evidence at the Common Law,* 422 *et seq.* (1898) ; 9 *Wigmore, Evidence* § 2472 (3d ed. 1940) ; 3 *Restatement of Property* §§ 241–248 ; § 241, comment (a). We thought it implicit in *Cook* and the later cases we have cited that direct statements of intention should be admitted no matter what the form of the ambiguity. If our task is to ascertain and follow the testator's probable intent, we cannot fairly exclude evidence of that intent. Naturally, the circumstances surrounding the evidence may

affect what weight, if any, it is to be given but it should not be excluded.

██ Putting these remarks into the context of the present case, it is apparent that the trial court properly admitted the testator's memoranda and the scrivener's testimony regarding the testator's statements to him and the origin of the disputed word "philanthropic." While "philanthropic" may be technically broader than "charitable," we think that it has come to mean the same thing in modern usage. However, even if it has not, it is ambiguous enough to be construed as such. Most words are susceptible of more than one meaning, for as Justice Holmes has remarked: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 *U. S.* 418, 425, 38 *S. Ct.* 158, 159, 62 *L. Ed.* 372, 376 (1917). Whether the use of a word which admits of more than one meaning is a patent ambiguity in the technical sense is not important;[10] rather, the significant point is that there is an ambiguity at all. And in deciding whether there is an ambiguity, a court should always admit extrinsic evidence including direct statements of intent since experience teaches that language is so poor an instrument for communication or expression that ordinarily all such evidence must be examined before a court can be satisfied of whether an ambiguity exists. *Cf. Garden State Plaza Corp v. S. S. Kresge Co.*, 78 *N. J. Super.* 485 (App. Div. 1963). We do not, of course, mean to imply that such evidence can be used to vary the terms of the will, but rather that it should be admitted first to show if there is an ambiguity and second, if one exists, to shed light on the testator's actual intent.

---

[10]Page defines a patent ambiguity as follows: "A patent ambiguity is defined as one which is apparent upon the face of the instrument, as where in wills the same tract is disposed of in different clauses to different individuals." 4 *Page, Wills, p.* 255.

■ In light of the above, it appears clear to us that the testator intended "philanthropic" to have the legal equivalence of "charitable." And if there were any doubt, well established rules of construction would lead us to lean in favor of a construction which upheld the gift as charitable. *Noice v. Schnell,* 101 *N. J. Eq.* 252 (E. & A. 1927); *Hesketh v. Murphy,* 36 *N. J. Eq.* 304, 309 (E. & A. 1927).

Our determination that the bequest under Article Sixth, Section (C)(12) is valid makes it unnecessary to consider the application of *N. J. S. A.* 3A:3–14, the anti-lapse statute.

The judgment of the Chancery Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.